# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  03-20048-CV-King

SECURITIES AND EXCHANGE COMMISSION,    )
                                 **Plaintiff,**    )

v.    )

GETANSWERS, INC.,    )
JAMES KOENIG and    )
ROBERT COURNOYER,    )
DAVID NEPO,    )
BARRINGTON SCHNEER and    )
CHARLES EHRLICH,    )

                                 **Defendants,**    )

and    )

OCEANMARK CONSULTING GROUP, INC.    )

                               **Relief Defendant.**    )

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges that:

### INTRODUCTION

1.      The Commission brought this action to restrain and enjoin Defendants from continuing to violate the federal securities laws in connection with the unregistered offering of securities issued by Defendant GetAnswers, Inc. ("GetAnswers" or "the company"), in the form of common stock ("stock" or "shares").  GetAnswers was purportedly in the business of operating an Internet "knowledge management service company."



2.      Since at least December 2000 through the filing of this action, GetAnswers, its principals, Defendants James Koenig ("Koenig"), Robert Cournoyer ("Cournoyer"), David Nepo ("Nepo"), Barrington Schneer ("Schneer") and its head sales agent Charles Ehrlich ("Ehrlich") raised approximately $7.5 million from hundreds of investors nationwide, primarily physicians, through an in-house boiler room operation.  GetAnswers, through its offering and marketing materials and/or sales representatives, made numerous false representations and omissions to investors relating to, among other things, GetAnswers' president and chief executive officers' experience in starting successful Internet companies, GetAnswers' affiliation with a college, the use of investor proceeds, the safety and profitability of an investment in the company and its compliance with all securities laws.

## DEFENDANTS

3.      GetAnswers is a Delaware corporation, incorporated in May 2000, whose principal offices were located at 18305 Biscayne Blvd., Suite 212, Aventura, Florida 33160.

4.      Koenig is 34 years old and resides in Miami Beach, Florida.  Koenig was the chief executive officer and president of GetAnswers.

5.      Cournoyer is 35 years old and resides in Miami, Florida.  Cournoyer was GetAnswers' chief operating officer.

6.      Nepo is 34 years old and resides in Miami Beach, Florida.  Nepo was GetAnswers' founder and chairman of its board of directors.

7.      Schneer is 34 years old and resided in Miami Beach, Florida at all relevant times. Upon information and belief, Schneer may be concealing his whereabouts.  Schneer was GetAnswers' vice-president of corporate development.

8. Ehrlich is 49 years and resides in Sunny Isles, Florida. Ehrlich was GetAnswers' top sales agent.

## RELIEF DEFENDANT

9. Relief Defendant OceanMark Consulting Group, Inc. ("OceanMark") is a Florida corporation, incorporated in October 2000, and was under the control of Cournoyer. Oceanmark's principal place of business was the same as GetAnswers.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

11. This Court has personal jurisdiction over Defendants and venue is proper in the Southern District of Florida because many of Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida. In addition, the principal offices of Defendant GetAnswers were located in the Southern District of Florida and the individual Defendants reside or resided in the Southern District of Florida.

12. Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

## THE FRAUDULENT SCHEME

**I.    GetAnswers' Illegal Offering**

13.    GetAnswers operated an Internet knowledge management service company which claimed it was developing an interactive Internet website for use by college and high school students.

14.    GetAnswers raised money from the general public, primarily physicians, by offering securities in the form of common stock.   GetAnswers offered securities from approximately December 2000 to the filing of this action, and raised at least $7.4 million from more than 240 investors located throughout the country.   GetAnswers' stock was sold in $10,000 blocks at between $2 and $3 per share, depending on the tranch of shares offered at the time.

15.    GetAnswers solicited investors through an in-house boiler room staffed with unlicensed sales representatives.   The unlicensed sales representatives were hired by GetAnswers and paid commissions through GetAnswers' checking accounts.

16.    GetAnswers solicited doctors by sending an unsolicited facsimile inviting them to join GetAnswers' "medical advisory board," and offering compensation for answering medical questions submitted to GetAnswers' website.   The "medical advisory board" was primarily a ruse to create a list of doctors that sales representatives could later contact to pitch GetAnswers' stock.

17.    Doctors who joined GetAnswers' "medical advisory board" received telephone calls from sales representatives offering to sell them GetAnswers' stock which was purportedly exclusively reserved for board members.   Doctors who did not join GetAnswers' medical advisory board were also called by sales representatives offering to sell them GetAnswers' stock.

18.    As part of the sales pitch, GetAnswers' sales representatives created a sense of urgency to induce the doctors to invest quickly by telling them that there was a limited amount of stock, the available stock was "dwindling" or that prices of the stock were about to go up.

19.    After the introductory sales pitch, GetAnswers sent the doctors offering materials by overnight delivery.    These materials included, among other things, a Private Placement Memorandum ("PPM") and various marketing materials. GetAnswers' sales representative called the doctors repeatedly to try and close the sale of GetAnswers' shares.

20.    No registration statement was filed or in effect with the SEC in connection with the securities that GetAnswers offered and sold.  Moreover, GetAnswers did not require its sales representatives to hold any securities licenses.

## II.    The Material Misrepresentations and Omissions

21.    GetAnswers made materially false representations and omissions in connection with the offer and sale of its securities in offering materials, on its website and through sales representatives.

### A.    Misrepresentations and Omissions in the PPMs

22.    GetAnswers had three versions of its PPM: one dated March 31, 2001 ("PPM 1"); one dated June 30, 2001 ("PPM 2"); and one dated July 31, 2002 ("PPM 3) (collectively referred to as "PPMs").

#### 1.    Management's Background

23.    GetAnswers' PPMs represented to investors that it was "led by a management team experienced in successful start-ups..." and extolled Koenig's purported past experience as an Internet start-up entrepreneur.  The PPMs stated:

> While still attending business school at the University of Florida,
> Mr. James Koenig founded an Internet company (EZ Notes) that

5

provides educational services to college students. Within one year of inception, Mr. Koenig had successfully developed the company to a national scalable model and secured $25 million of venture capital financing which led to a successful implementation of a national strategy (Allstudents.com) and then subsequent sale of the company to a subsidiary of a Fortune 500.

24.     This information was false. Koenig was not the founder of EZ Notes and he never developed the company into a national scalable model nor secured $25 million in venture capital financing. EZ Notes was also never sold to a subsidiary of a Fortune 500 company.

### 2.      Alliance/Co-Venture with a College

25.     GetAnswers' PPM 2 and PPM 3 stated that GetAnswers negotiated an "academic alliance" with a South Florida college ("the college") to provide 600 online courses on its website in the fall of 2001.

26.     GetAnswers' website further stated that it had finalized a "co-venture" with the college. More specifically, Cournoyer stated in an audio clip that was available on GetAnswers' website that GetAnswers was offering "over fifty accredited online classes through a joint venture with [the] college."

27.     In contrast to these representations, GetAnswers never negotiated an "academic alliance" nor finalized a "co-venture" with any college. GetAnswers also never offered any accredited online classes on its website through a joint venture with any college.

### 3.      Use of Investor Proceeds

28.     GetAnswers' PPMs falsely represented to investors that their investments would be used to primarily fund the development of its website. GetAnswers' PPMs stated:

> The proceeds from capitalization efforts by the Company, of which this Offering is a part, will be primarily utilized to finance (i) renumerating nepo.com for incubation up to the date of this Offering; (ii) completing license agreements with technology companies that will provide key software for the web site; (iii)

preparing office space; (iv) purchasing hardware and software required for preparing the web site; (v) the planning and implementation of the web site programming; (vi) launching and enhancing the web site; and (vii) reserves for acquiring supplementary technologies and companies that enhance the value of GetAnswers.

29.    The PPMs also represented that "...in the interest of preserving equity capital and shareholder wealth, the company will attempt whenever possible to limit the expenses so set forth in the 'Use of Proceeds' statement."

30.    These representations were grossly false.  A significant portion of investor funds were used to pay undisclosed commissions ranging between 7% to 12% and to pay for luxury automobiles and other lavish perks such as cash advances and expensive dinners for GetAnswers' management and employees.

31.    By way of example, the following chart shows, in part, how GetAnswers used some of the approximately $5.3 million raised through June 30, 2002:

| USE OF PROCEEDS | APPROX. AMOUNT EXPENDED | % OF AMOUNT RAISED |
| --- | --- | --- |
| Payments to Defendant Cournoyer and six of GetAnswers' sales representatives | $1,590,000 | approx. 30% |
| Luxury cars and related expenses | $118,000 | approx. 2% |
| Payments to GetAnswers' corporate credit cards and other financial institutions | $367,000 | approx. 7% |

32.    When other GetAnswers' employees and managers wages are added, GetAnswers used at least 45% of investor funds on purported "salaries" during this time period.  In sum, over 54% of the investor funds raised through June 30, 2002 were used to enrich GetAnswers' management and employees.

### 4.   Misrepresentations Relating to Cournoyer's Salary

33.    GetAnswers PPMs also misrepresented the amount of compensation paid to Cournoyer. PPM 1 represented that Cournoyer's compensation for 2001 was $55,000. In reality, GetAnswers paid Cournoyer $507,809 in 2001, and an additional $25,450 to Cournoyer's corporation, OceanMark.

34.    In GetAnswers' PPM 2, Cournoyer's salary was raised to $200,000 for 2001, yet this figure was less than half of the money he received from GetAnswers in 2001. PPM 2 continued to be sent to investors even after the representation about Cournoyer's compensation was historically false.

35.    PPM 3 stated that Cournoyer's compensation for 2002 was still $200,000, but by June 30, 2002, one month prior to PPM 3's date, Cournoyer was already paid $420,844 by GetAnswers for the first six months of 2002, over $220,000 more than the compensation disclosed in the PPM for the entire year of 2002.

### 5.   Diversion of Investor Proceeds for Improper Uses

36.    Investor proceeds raised by GetAnswers were improperly diverted to certain of GetAnswers' principals, entities under their control or nominees.

37.    GetAnswers, at the direction of Nepo and with the knowledge of Schneer, paid $150,000 to an entity controlled by Nepo called Nepo, Inc.  The $150,000 was not remuneration for services, a loan repayment nor reimbursement for expenses or start-up costs.

38.    Ronald Welch, a resident of Israel, who is listed as an officer of GetAnswers in the company's offering and marketing material received $287,460 in investor funds.   A dissolved corporation owned by Ronald Welch, Ladies of Style, Inc., was paid at least $149,431

8

by GetAnswers.   None of these payments were remuneration, loan repayments nor reimbursements for expenses or start-up costs.

39.      Investor proceeds were also used by GetAnswers' principals for risky business ventures which were outside the scope of GetAnswers' business plan.  Nepo and Schneer utilized $193,000 of investor monies to fund an offshore internet bank project and used $50,000 of investor funds to try to establish a multimedia center for music or film production.  Both of these projects were ultimately unsuccessful.

40.      Schneer also purchased between $30,000 and $40,000 of movie memorabilia on e-bay.com.

### 6.      Operating Expenses

41.      GetAnswers' PPMs grossly understated its operating expenditures.  All three of GetAnswers' PPMs included a general ledger attachment for the period covering January 1, 2001 through March 31, 2001 ("Q1 2001").  GetAnswers' PPM 3 also included a general ledger attachment for the period covering October 1, 2001 through December 31, 2001 ("Q4 2001").

42.      As the following chart illustrates, GetAnswers understated its expenditures for Q1 2001 by approximately 45%, and for Q4 2001 by approximately 25%:

| GENERAL LEDGER | EXPENSES STATED IN PPMs | EXPENSES IN BANK RECORDS | PPMs UNDERSTATE EXPENDITURES BY |
|---|---|---|---|
| Q1 2001 | $185,883 | $270,000 | approx. 45% |
| Q4 2001 | $967,742 | $1,200,000 | approx. 25% |

### 7.      Conflicts of Interest

43.      GetAnswers' PPMs failed to disclose certain conflicts of interest.  Under a section in the PPMs titled "Conflicts of Interest" GetAnswers made a series of disclosures regarding ownership interests of its management in other corporations doing business with GetAnswers.

The PPMs, however, did not disclose that GetAnswers paid $45,000 to OceanMark, a corporation owned by Cournoyer, $245,000 to a corporation owned by its chief technology officer and $4,000 to a corporation jointly owned by its chairman of the board and its vice president of international relations.

### B.   Misrepresentations Made by Sales Representatives

#### 1.   Availability of Stock

44.   GetAnswers' sales representatives used hard-sell techniques designed to create a false sense of urgency in the investor.  For example, sales representatives, including Ehrlich, told investors that they could purchase GetAnswers' shares for $2 each (later changed to $3) before the purchase price was raised to $5 a share in the very near future.  Sales representatives stressed to investors that they needed to make their purchase quickly or miss out on the opportunity to invest at $2 or $3 a share.

45.   At least one investor received a facsimile from GetAnswers in August 2001 stating that all the $2 stock was sold, the $3 stock was "already dwindling" and that only $ 5 shares were available to future accredited investors.

46.   Notwithstanding these representations, GetAnswers never raised the share price of its stock to $5 a share.  GetAnswers sold its shares at $2 until at least March 2002 at which time the price was increased to $3 a share.  Therefore, any representation regarding the limited availability of $2 or $3 shares was false.

#### 2.   Safety and Return on Investment

47.   GetAnswers' sales representatives, including Ehrlich, made false and misleading sales pitches concerning the safety of, and return on an investment in, GetAnswers' securities.

GetAnswers' sales representatives told investors that "you can't lose" and represented that they could expect a 100% to 400% return on their investment within the next few months to a year.

48.     Investors were also told by GetAnswers' sales representatives, including Ehrlich, that a merger was going to take place and/or that the stock would split in the near future, which would generate a sizable, immediate return.   This sales pitch was reinforced by GetAnswers PPMs which stated "...a sizable return could be realized through corporate profits, asset growth, capitalization, acquisitions, merger or IPO."

49.     These promises of immediate or large returns on investments were patently false because GetAnswers was a company with no operating history, generated little or no revenue and was involved in a new and speculative line of business.

### 3.     Falsehoods About Going Public

50.     GetAnswers' sales representatives, including Ehrlich, also misled investors by telling them that GetAnswers was seeking SEC approval to go public in the near future. GetAnswers had not, however, taken even the most basic steps toward becoming a publicly traded company.

51.     GetAnswers never filed any registration statements with the SEC to publicly sell shares, never obtained audited financials or hired an underwriter.  GetAnswers' projection of a public offering was therefore utterly baseless and false.

### C.     False Information on GetAnswers' Website Regarding its Legal Representation

52.     GetAnswers' website contained material omissions.  Specifically, GetAnswers' website asserted that its outside counsel, Sheldon Zipkin ("Zipkin"), ensured compliance with "SEC securities laws."  GetAnswers' website further stated that Zipkin had, among other things, personally signed on as:

[T]he supervisory attorney "of counsel" for the company requiring all materials, procedures, and executive decisions to be reviewed by and/or personally made to his attention for review. . . His position also empowers his firm to unilaterally review upon demand the operational and managerial decisions made at the company; thereby, providing an external, independent entity to oversee the governance, management and legal relations for the company at large.

53.      Zipkin reiterated his background and confirmed his role at GetAnswers through an audio clip on GetAnswers' website.    For example, Zipkin stated "I evaluate the representations that the company makes to the government, to its shareholders, to the public."

54.      GetAnswers falsely implied that its investors were protected by competent counsel, but failed to disclose Zipkin's disciplinary history with The Florida Bar.  This history included an admonishment in 1996 for failure to diligently represent a client, and a public reprimand (with one year of probation) in 1999 for, among other things, his failure to provide competent representation by accepting money to file an appeal and then not filing the appeal in a timely manner resulting in its dismissal.  Zipkin was also ordered in 1999 to have his law practice analyzed by the Law Office Management Advisory Service of The Florida Bar with respect to file management and calendaring of dates incident to client representation.

55.      These incidents, which are publicly available information, were not disclosed on GetAnswers' website, in Zipkin's audio clip nor in PPM 2 or PPM 3.

**III.    Role of the Individual Defendants**

**A.      Nepo**

56.      Nepo was the founder of GetAnswers.   Nepo was the majority shareholder and chairman of the board.   Nepo directly participated in the management of GetAnswers and was involved in its operations at the highest levels.

57.     By reason of his position as founder and chairman of the board of GetAnswers, Nepo had decision making authority and controlled, or had the power to control, the business of GetAnswers.

58.     Nepo reviewed or approved GetAnswers' PPMs and marketing materials.

59.     Nepo regularly received GetAnswers' comptroller reports detailing the company's expenditures.

60.     Based on the foregoing and the other allegations set forth above in this Complaint, Nepo knew, or was severely reckless in not knowing, that material misrepresentations and omissions were made to investors in GetAnswers' offering and marketing materials and by sales representatives.

**B.      Schneer**

61.     Schneer was GetAnswers' vice-president of corporate development.

62.     Schneer directly participated in the management of GetAnswers and was directly involved in its day-to-day operations.

63.     By reason of his position as vice-president of corporate development, Schneer had significant decision making authority, and controlled, or had the power to control, the content of GetAnswers' PPMs, marketing materials, website and statements by sales representatives.

64.     Schneer, who has a juris doctor degree but is not a member of any bar, also performed the duties of in-house lawyer.   Schneer performed legal research for GetAnswers under the federal securities laws including sales representatives registrations issues, solicitation rules and registration exemptions.

65.     Schneer drafted, reviewed or approved GetAnswers' PPMs and marketing materials which were replete with material misrepresentations and omissions.

66.     Schneer was a signatory on GetAnswers' bank accounts and had full knowledge of the uses of investors' proceeds.

67.     Schneer participated in the diversion of investor monies to fund business projects such as an offshore-internet bank and multimedia center. Schneer purchased movie memorabilia with investor funds from e-bay.com. Schneer also used a luxury vehicle, registered in the name of Ronald Welch, which was paid for with GetAnswers' investor funds.

68.     Based on the foregoing and the other allegations set forth above in this Complaint, Schneer knew, or was severely reckless in not knowing, that material misrepresentations and omissions were made to investors in GetAnswers' offering and marketing materials and by sales representatives.

**C.     Koenig**

69.     Koenig directly participated in the management of GetAnswers and was directly involved in its day-to-day operations at the highest levels. By reason of his position as CEO and president of GetAnswers, Koenig had significant decision-making authority in GetAnswers and controlled, or had the power to control, the content of GetAnswers' PPMs, marketing materials, website and statements by sales representatives.

70.     Koenig was also directly involved in the solicitation of investors. For example, Koenig signed the initial unsolicited facsimile sent to doctors inviting them to join GetAnswers' "medical advisory board" that was the pretext used to solicit investors. GetAnswers' offering materials also included a signed introductory letter from Koenig touting GetAnswers as an investment and comparing GetAnswers to successful Internet companies. The letter states in part "[j]ust imagine the profits realized for those investors who took positions in the first generation Internet companies" and that based on GetAnswers' "Internet proven leadership...we look

forward to the same growth experienced by the initial generation search engine and e-commerce companies…"

71.     Koenig's false professional background was highlighted in the offering materials. The sales representatives further embellished Koenig's background by identifying The Walt Disney Co. as the Fortune 500 company that bought Allstudents.com.

72.     Koenig touted GetAnswers on its website through an audio clip and was active in GetAnswers' operations through the newsletters and e-mails he sent to its investors and medical board members.

73.     Based on the foregoing and the other allegations set forth above in this Complaint, Koenig knew, or was severely reckless in not knowing, that material misrepresentations and omissions were made to investors in GetAnswers' offering and marketing materials and by sales representatives.

**D.     Cournoyer**

74.     As the COO of GetAnswers, Cournoyer directly participated in the management of GetAnswers and was directly involved in its day-to-day operations at the highest levels. Cournoyer directly oversaw the day-to-day operations of GetAnswers' in-house boiler room.

75.     GetAnswers' website stated that Cournoyer was "…responsible for identifying, qualifying, securing and servicing capital funding services." Cournoyer had the power to control GetAnswers' fundraising actions and policies, and shared the ability to control some, if not all, of GetAnswers' corporate actions and policies in other areas.

76.     Cournoyer personally solicited funds from potential investors and communicated with potential investors in writing. In particular, Cournoyer sent prospective investors a letter, which touted Koenig's Internet background and stated that:

> ...GetAnswers has the benefit of a seasoned President who successfully pioneered the Internet during its boom from 1996 to 2000 (Allstudents.com which later turned into EZNotes.com which was purchased by Disney).

77.   Cournoyer was also heard on GetAnswers' website through an audio clip stating that as a "principal owner, I have many duties," and touting GetAnswers by stating "I feel that this venture will be my largest and most successful company to date" and that his biggest role is in "securing capital funding." In a separate audio clip, Cournoyer falsely claimed that GetAnswers was operating a joint venture with the college.

78.   Cournoyer received, and authorized the payment of, transaction-based compensation, in the form of commissions in connection with the sale of GetAnswers' securities.

79.   Based on the foregoing and the other allegations set forth above in this Complaint, Cournoyer knew, or was severely reckless in not knowing, that material misrepresentations and omissions were made to investors in GetAnswers' offering and marketing materials and by sales representatives.

### E.   Ehrlich

80.   Ehrlich personally solicited funds from GetAnswers' investors while using the alias "John Lloyd." Ehrlich used the alias to mask his identity because he is a convicted felon on parole for drug trafficking.

81.   Ehrlich told numerous untruths to lure investors to invest in GetAnswers. Among other things, Ehrlich told investors they were purchasing the GetAnswers' stock at $3.00 per share but that it was worth $5.00. Ehrlich also told over fourteen investors that GetAnswers was seeking SEC approval to go public and/or that GetAnswers was about to be acquired by a Fortune 500 company. Ehrlich misled investors by stating that their investment was "safe" with little or no risk and that he did not receive commissions.

82.     Ehrlich was GetAnswers' top sales agent and earned over $500,000 in transaction-based commissions for selling GetAnswers' stock.

83.     Based on the foregoing and the other allegations set forth above in this Complaint, Ehrlich knew, or was severely reckless in not knowing, that material misrepresentations and omissions were made to investors in GetAnswers' offering and marketing materials and by sales representatives.

**COUNT I**

**SALE OF UNREGISTERED SECURITIES IN VIOLATION OF
SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT**

84.     The Commission repeats and realleges paragraphs 1 through 83 of this Complaint.

85.     No registration statement was filed or is in effect with the SEC pursuant to the Securities Act and no exemption from registration exists with respect to the securities and transactions described in this Complaint.

86.     Since a date unknown, but from at least December 2000 through the filing of this action, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich directly and indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise; (b) carried securities or causing such securities, as described in this Complaint, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, as described in this Complaint, without a registration statement having been filed or being in effect with the SEC as to such securities.

87.     By reason of the foregoing, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich, directly and indirectly, violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### VIOLATION OF
### SECTION 17(a)(1) OF THE SECURITIES ACT

88.     The Commission repeats and realleges paragraphs 1 through 83 of this Complaint.

89.     Since a date unknown, but since at least December 2000 through the filing of this action, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

90.     By reason of the foregoing, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich, directly and indirectly, violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER

91.     The Commission repeats and realleges paragraphs 1 through 83 of this Complaint.

92.     Since a date unknown, but since at least December 2000 through the filing of this action, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue

statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating or will operate as a fraud upon the purchasers of such securities.

93.    By reason of the foregoing, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich, directly or indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240. 10b-5, thereunder.

### COUNT IV

### VIOLATION OF
### SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT

94.    The Commission repeats and realleges paragraphs 1 through 83 of this Complaint.

95.    Since a date unknown, but since at least December 2000 through the filing of this action, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which are operated as a fraud or deceit upon purchasers and prospective purchasers of such securities.

96.    By reason of the foregoing, Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich, directly and indirectly, violated and, unless enjoined, will continue to

violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## COUNT V

### SECTION 20(a) – CONTROL PERSON – LIABILITY FOR GETANSWERS' VIOLATIONS OF SECTIONS 5(a), 5(c),  AND 17(a) OF THE SECURITIES ACT AND SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

### (Against Defendants Koenig and Cournoyer)

97.      The Commission repeats and realleges paragraphs 1 through 83 of this Complaint.

98.      Since at least December 2000 through the filing of this action, Defendant Koenig was directly or indirectly, a control person of Defendant GetAnswers for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

99.      Since at least December 2000 through the filing of this action, Defendant Cournoyer was, directly or indirectly, a control person of Defendant GetAnswers for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

100.     Since at least December 2000 through the filing of this action, Defendant GetAnswers violated Sections 5(a), 5(c) and 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

101.     As control persons of GetAnswers, Defendants Koenig and Cournoyer are jointly and severally liable with and to the same extent as GetAnswers for its violations of Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

<u>COUNT VI</u>

### UNREGISTERED BROKER-DEALER IN VIOLATION OF <u>SECTION 15(a)(1) OF THE EXCHANGE ACT</u>

**(Against Defendants Cournoyer and Ehrlich)**

102.     The Commission repeats and realleges paragraphs 1 through 83 of its Complaint.

103.     From approximately December 2000 through the filing of this action, Defendants Cournoyer and Ehrlich, by use of the mails or any means or instrumentality of interstate commerce, willfully effected transactions in, or induced or attempted to induce the purchase or sale of GetAnswers' stock as a broker without having been registered with the Commission as such in accordance with Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o.

104.     By reason of the foregoing, Defendants Cournoyer and Ehrlich, directly and indirectly, violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

<u>**RELIEF REQUESTED**</u>

**WHEREFORE**, the Commission respectfully requests that the Court:

### I. <u>Declaratory Relief</u>

Declare, determine and find that Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich committed the violations of the federal securities laws alleged in this Complaint.

### II. <u>Permanent Injunctive Relief</u>

Issue a Permanent Injunction, restraining and enjoining:

(a)     Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich their officers, representatives, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 5(a) and 5(c) of the Securities

Act, 15 U.S.C. §§ 77e(a) and 77e(c);

(b)     Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich their officers, representatives, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; and  Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3);

(c)     Defendants Koenig and Cournoyer their officers, representatives, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating, as control persons, Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

(d)     Defendants Cournoyer and Ehrlich their officers, representatives, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 15(a)(1) of the Exchange Act and 15 U.S.C. §78o(a)(1).

### III. Disgorgement

Issue an Order requiring Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer, Ehrlich and Relief Defendant OceanMark to disgorge all ill-gotten profits or proceeds that they received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

### IV. Penalties

Issue an Order directing Defendants GetAnswers, Koenig, Cournoyer, Nepo, Schneer and Ehrlich to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## V. __Penny Stock Bar__

Issue an Order, pursuant to Section 603 of the Sarbanes-Oxley Act of 2002 [Public Law No. 107 - 204, 116 Stat. 745 (July 30, 2002)], Section 21(d)(6) of the Exchange Act,15 U.S.C. § 78u(d)(6), and Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and pursuant to the Court's equitable powers, permanently barring Koenig, Cournoyer, Nepo, Schneer and Ehrlich from participating in an offering of penny stock.

## VI. __Further Relief__

Grant such other and further relief as may be necessary and appropriate.

Respectfully submitted,

March __3__, 2004          By:

Kerry A. Zinn
Senior Trial Counsel
Florida Bar No. 0118559
Direct Dial:  (305) 982-6379

Attorney for Plaintiff
__SECURITIES AND EXCHANGE
COMMISSION__
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by U.S. Mail this 3rd day of March, 2004 on:

Jonathan Butler, Esq.
Kathy M. Klock, Receiver
Steel Hector & Davis, LLP
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
561/655-1509 Fax

Dan Newman, Esq.
Tew Cardenas Rebak Kellogg Lehman
DeMaria, Tague, Raymond & Levine, LLP
201 S. Biscayne Blvd., Suite 2600
Miami, FL 33131
*Counsel for James Koenig and David Nepo*
305/536-1116 Fax

Joseph R. Buchanan, Esq.
Wampler, Buchanan,Walker et al
SunTrust International Center, Suite 1700
One S.E. Third Avenue
Miami Florida 33131
*Counsel for Robert Cournoyer, individually, and as*
*Officer/Director of OceanMark Consulting Group, Inc.*
305/577-8545 Fax

Barrington Schneer
616 W. 51st St.
Miami Beach, FL 33140

Kerry Zinn